The court now calls case number 119-220 Stephen I. Valfer, M.D. v. Evanston Northwestern Healthcare, etc. Are you ready to proceed? Are you ready? Good morning, Your Honors. I'm Leslie Rosen on behalf of Dr. Stephen Valfer, the appellant in this case. And thank you very much for accepting our petition to appeal for this individual. And the primary issue on appeal is whether the appellate court erred, in this case involving the Hospital Licensing Act, Section 10.2, in requiring Dr. Valfer to plead and prove physical harm to avoid immunity. Now, you know that immunity is an affirmative defense, and so the appellate court essentially found that there was a violation and they were not entitled to summary judgment in this case under this breach of contract action, but that Dr. Valfer didn't plead and prove physical harm. Of course Dr. Valfer didn't plead and prove physical harm. One doesn't typically or ever prove and plead physical harm in a breach of contract action. Breach of contract is what a doctor has to rely on because he has a contract with the hospital based on the bylaws. In this case, Dr. Valfer claimed that his privileges at Evanston North Shore were revoked and that he was entitled to peer review. He didn't get peer review. There's no question about it. Evanston characterizes this case as one involving non-reappointment. But the statute is very clear that the policy of the state of Illinois is to encourage peer review, and that because peer review is so important and because doctors apparently don't want to participate in it unless they're given some tremendous benefit like immunity, that you cannot proceed against a hospital for its breach of contract action unless you can show willful or wanton misconduct of the committee. And then the statute goes on to describe and to define what is willful and wanton conduct. And the statute says, for the purposes of this section, willful and wanton misconduct means a course of action that shows actual or deliberate intention to harm or that if not intentional, shows an utter indifference to or conscious disregard for a person's own safety or the safety of others. Nowhere in the statute does it say you have to plead and prove physical harm in order to proceed in this breach of contract action. The plain words of the statute don't say it. We all know the rules of statutory construction, that if the statute is clear and unambiguous, you just apply the rules, you don't look to extrinsic evidence. And in this case, I'm arguing both the plain words of the statute don't. If you consider this an unambiguous statute, that the statute does not require this kind of proof. And then otherwise, if you can look at it and certainly find it to be ambiguous, and in that case a pleading requirement of physical harm leads to absurd results. What the appellate court did in this case is ignore the fact that the statute says deliberate intent to harm or, if not intentional, conduct that is not intentional. The court then conflated the terms, well, deliberate intent to harm with intentional conduct. And that conflation is wrong. Plain and simple. The question is, was there a deliberate intent to harm? And the court just ignored the first part of the statute. This case should have turned on whether there was a deliberate intent to harm, Dr. Valfer. The fact that there may be or there typically is a harm, an economic harm to a doctor, does not mean there's a deliberate intent to harm. Harm in that case could be a byproduct of what happens here. Ms. Rosen? Yes. Are you saying that there's an exception provided for immunity from intentional breaches of contract? Did I read that in your reply brief? There's an exception to immunity for intentional breaches of contract? Well, not necessarily intentional breaches of contract, but deliberate intent to harm. You can deliberately breach a contract by making a very ministerial error, but you have to show to be entitled to the immunity that there was a deliberate intent to harm. You can have a breach of contract by showing an intentional little error, but a deliberate intent to harm. That's what I'm getting at. Explain an intentional breach versus a non-intentional breach using your terminology. Okay. In my view, peer review hearing can be held without a deliberate intent to harm. You can do that. A hospital can do that by following its bylaws and showing reasonable concern for patient safety. That's what this statute is designed to protect and to promote, patient safety. But let's say you have a doctor who is a pain in the neck, a doctor who's always complaining about the hospital procedures. Maybe the hospital isn't clean enough. Maybe the hospital rules aren't adequate to protect safety, and the hospital decides to go after that doctor. That would be a deliberate intent to harm. Or you have a doctor, let's say there is, in a case of an OB-GYN, maybe you have a doctor who performs abortions, and maybe the other doctors don't like that, and maybe they want to go after him. Or maybe you have a doctor who has a big lock on particular procedures and is very popular in the community and has other doctors who are professionally jealous. And that could be a deliberate breach. But you could certainly have a hearing that follows the bylaws and does not show any deliberate intent to harm. It could happen, I would think, overwhelmingly. But you do have certain cases where that's not the case. And that's why this court has allowed for limited judicial intervention and involvement. And in the Atkins versus Sarah Bush case. Does that answer your question? No. Okay, thank you. Can I ask you this? In your case, was there pleading and proof at the summary judgment level of this kind of harm that you're describing? This case didn't get that far. Okay? Summary judgment? Summary judgment. The trial court held a summary judgment that this case was about reappointment, not revocation, first of all. And so there was no need for the hospital to conduct peer review, okay, under part of the bylaws. There was no need for peer review. They admit there was no peer review. They didn't have to reappoint him. We said to beat the summary judgment, this case was about revocation and we should have done that. Then the court held, but you know what? Even if this case was, forgetting that, the hospital is entitled to immunity because you didn't plead and prove physical harm. So did you plead? Let's take physical harm off the table for a minute. Did you plead some kind of animus by the hospital? Dr. Vailford did. At his hearing, he did testify that the people who were involved in the hearing, the hearing that he did get, were his direct competitors. And that they didn't follow any of the rules. They were his direct competitors. It was somewhat of a professional jealousy sort of thing. And so you think that's the kind of intentional conduct that the statute is addressing? This sort of professional jealousy, that that would be enough? That can be one or whistleblowing. In the Larson case, it was a matter of whistleblowing. But in your case, that's the animus that you're talking about? Yes. Professional jealousy, inappropriate. He was not up for re-hearing, for reappointment at the time this started. And Dr. Vailford's claim, two of his direct competitors kind of engineered this. Dr. Silver, who was the doctor who signed off on him, said he testified at the hearing. He relied completely on Dr. Nelson. Dr. Nelson was a direct competitor. Dr. Vailford did a lot of laparoscopic procedures at the hospitals. He did more than anybody else by many times more. That was his expertise. That was the claim. That was the claim. And whether that should have been deemed appropriate should have been a question of fact. He should have been entitled to it. Are you here alleging actual and deliberate intention to harm? Yes. Or the alternative? No, deliberate intention to harm. There is no conscious disregard for a person's own safety or the safety of others. Safety is a peculiar term here. It doesn't have any relevance to it. But what the appellate court did in this case was write out the first section of the statute. The court said, well, of course it's intentional. Of course it's intentional. If you deprive somebody of their privileges, of course there's going to be harm. But there is. That's right. You're not going to have. You're going to have economic harm, which is a breach of contract term, not a tort. But. The legislature, though, if it had wanted to, could have carved out an exception to immunity for non-tort claims such as breach of contract, right? This is all about breach of contract. I understand. And what I'm saying is the legislature could have carved out immunity if such claims were committed with some sort of malice. But they didn't do so. Well, that's a very interesting point. Yes. If you look at my amicus brief from the Illinois Trial Lawyers Association, we have a compilation of the 50 states and what they do have. And Illinois is the only state that has now this requirement for physical harm. But generally the statutes do talk about malice or reasonable belief. And interestingly enough, I think if you're going to consider this like a tort that would impose punitive damages, normally breach of contract you don't care about motive. It's just breach of contract. It's not a tort. But if you want to get punitive damages in a breach of contract case, according to Morrill v. Goldschmidt, this court's case from 1986, you have to show malice, wantonness, or oppression. Those are better terms, actually. You know, the legislature, I don't think the legislature really understood what it was doing here. They thought, if you look at the legislative debates, that they were imposing a regular definition of willful and wanton behavior. I don't think they contemplated anything like this. So what do you think they had something in mind here? So how do you think the statute works in the section, as you say, the disjunctive or? What does the or part mean? Deliberate intention to harm or that if not intentional shows an utter indifference to or a cautious disregard for a person's own safety and the safety of others. What do you think that means? I think what the legislature was doing was thinking, we're going to just adopt the regular definition of willful and wanton behavior, conduct. It's like the IPI. It's like all other cases because the problem is you're engrassing a tort principle on a breach of country and case. Just help me play out what this means. So there's immunity for this kind of peer review, but if the conduct is not intentional, there's this exception if there's a conscious disregard for a person's own safety and the safety of others. For the safety of others, I believe. I think and. Yes, I'm sorry, and the safety of others. So what does that mean? Whose safety are we talking about? Are we talking about the doctor's safety? Are we talking about patient's safety? What do you think this is talking about? That's a great question. The safety of others would definitely be a patient. If for some reason an utter indifference to the safety of others, if let's say it comes perhaps to a hospital committee's attention that a doctor is mistreating a patient and that the patient is at risk, that would be the safety of others. What could it mean, a person's own safety? The doctor's own safety? This brings up the point of why the statute's ambiguous. It doesn't make much sense to me. I'm sorry, it just doesn't make any sense. That's why if you don't look at the clear words and think it's unambiguous, you look at it and say, what does this mean? It doesn't make a lot of sense. I don't think the legislature was really focusing on this. They were trying to give, you know, to protect doctors and also to give, to protect patients and doctors who are on the committees in the hospitals, but also give doctors a little bit of leeway so that in egregious situations they could have some review. Some review, just a little review like the rest of us get. And it doesn't make any sense. So then when you look at it, you say, well, does it make, if it's ambiguous, first of all, you can look at extrinsic evidence, and then you see that the legislature, the limited, very limited talk about this statute shows they thought they were adapting the regular meaning of Wilf and Watten, and then you can also say, you know what, this leads to absurd results because truly it's absurd to think that there's going to be physical harm to a doctor. Ms. Rosen, couldn't the statute or can't the statute be interpreted clearly and logically to mean that the immunity applies to all civil damages claims, but it is only the tort claims that are subject to having the exception available for Wilf and Watten? There is no tort claim, though. Why? Why would that be when there is no tort claim? There's only a breach of contract claim here. There was initially a tortious interference claim, but then that claim was dropped. There is only a breach of contract claim. So I don't understand it. No. I think it's absurd. You would never, I don't think that the hospital has refuted the argument that this is not a situation where you're going to have harm to a doctor. It's just that simple. It's an absurd result, and it gives hospitals essentially absolute immunity. And why should that be? Why should hospitals get absolute immunity? The legislature didn't clearly show that it wanted to give hospitals absolute immunity. They used to give hospitals absolute immunity, and they changed it to have this limited immunity. Is every breach of contract case, then, where a doctor loses their privileges, is that going to end up in the circuit court? No. Not at all. And how does it discriminate? Well, you have to show a deliberate intent to harm. First of all, you could go out on summary judgment, simply stated that there was no breach of contract. Second of all, you could have compliance with the hospital bylaws and a fair hearing pursuant to the bylaws, which we didn't have here. You know, there was a hearing in terms of reappointment, but not revocation, which we say we're entitled to. These cases don't come up very often. Most doctors, they move on. These cases don't come up. You can see there aren't that many cases on point in the state of Illinois. It's not a mere violation. I mean, the Larson Court says in its opinion, well, this way, if it goes plaintiff's way, any mere violation would suffice. That is not so. You could have plenty of little violations that don't add up to a deliberate intent to harm. But any time they know that this is going to cost the doctor his position, his privileges, I mean, wouldn't that be enough to say, well, they deliberately intended to harm him? No. No. I don't think so. They in fact harmed by causing the ‑‑ if the hearing goes that way, but that's not a deliberate intent to harm. The primary concern, I think, that a hospital's job would be to show that the primary concern was to protect patient safety. That's what this statute is about, protecting the patients. And if you go to a hearing and you see that that's not an issue, but that in fact what is at issue is some either personal animus or resulting either from whistleblowing activities, as was the case with Dr. Larson, or something more personal, then you can show it. But not if you follow the rules and have a proper hearing. Then it's not going anywhere. It would be a very rare case. And that's what this court is supposed to be protecting, the rare case when there's limited judicial review. So I think the problem is really that this concept, willful and wanton, doesn't belong in the statute. It's poorly written and it's ambiguous. No other state has a requirement of physical harm, as I've said. And essentially, since there's very little on this matter, you have to look to the Larson opinion. You say, well, it seems there was Lowe versus Provena, which was decided in 2005. And that was a case where it was very, the holding in that case by the 4th District, was very ambiguous, I thought. And I thought that it left it very open. In the Lowe case, the court held, I'm quoting it, plaintiff alleged no facts and has offered no evidence from which we could reasonably infer the defendant actually intended to harm him. See 210 ILCS 85.102. His own safety was never an issue in this case. See 210, you know, blah, blah. And then because plaintiff's cause of action does not fit within the specialized definition of willful and wanton misconduct in section 10.2, the statute bars him. Okay, I think that pretty much reads that it's either or. They're reading it in the disjunctive. Ten years later, two of the same justices decided the Larson case and said, no, that's not what Lowe holds. Lowe holds that you must show physical harm. And then Lowe goes on to say, and so I think Lowe was wrong for a number of reasons, mostly because, again, deliberate intent to harm is not the same as causing harm. It's just a difference. The Larson opinion also relies on the statement that, well, the legislature hasn't acted on this in ten years, and we're going to take that to show that they agree. But I briefed it one way in my brief. I said, you know, first of all, this court can act despite the fact that the legislature didn't act. But on further review, I think the Larson court was just dead wrong. It's not that the legislature didn't act for ten years because it agreed. It didn't act for ten years perhaps because the Lowe court opinion is not nearly as harsh as the Larson opinion. And now the time would be running, not from 2005. Thank you, counsel. Your time has expired. I can't believe it. It goes very quickly when you're standing up there. I know that. Thank you. Thank you. May it please the court, Madam Chief Justice. It's time for this 14-year-old. Would you introduce yourself for the record, please? Matthew Carter representing North Shore. Thank you. Proceed. It's time for this 14-year-old dispute to come to an end. And that end should rest with the Illinois Hospital Licensing Act, the broad immunity that that act provides, and the same similar immunity that's provided in the Federal Health Care Quality Improvement Act. And I'd like to focus on the immunity that the two acts provide. And my colleague, Dave Dahlquist, will explain why, even if the acts don't apply, Dr. Balfour's complaint nevertheless fails because he cannot establish the breach of contract that he alleges. And that is all he's alleging is a breach of contract. He has no tort claims. He just alleges breach of contract. Now, I'll start with the licensing act. When the legislature enacted the licensing act, it made a decision that those best suited to make professional review decisions to evaluate the care of doctors are other doctors and hospitals, not courts down the road. And so what the legislature did was provide broad immunity for professional review decisions affecting quality care and patient care. So when the hospital finds a doctor that it believes has negatively affected patient care, has performed surgeries that were unnecessary, the hospital is encouraged to do what North Shore did here and to spend three years giving the doctor due process and reviewing his care and then making a decision without having to look over the hospital's shoulder to say, okay, well, after we've made this decision, am I going to find myself in court relitigating this again? That's not what the legislature wanted. And I think it's important to remember that this is not an act that provides absolute immunity. There are still methods that a doctor can use to ensure that he gets or she gets due process. You can get a declaratory judgment. You can file for an injunction to ensure if you're asking and you're saying, look, the wrong bylaws are applying to me, well, you can go to court and you can say, enforce the bylaws, make the hospital give me the due process I'm entitled to. And there's also now a very limited exception. It's the willful and wanton exception. And it applies as every Illinois appellate decision that's considered this question has found, when there's a physical harm that's alleged. That's right for three reasons. It's right based on the plain language of the statute. It's right because it's consistent with what willful and wanton conduct means in the context of a breach of contract, and that's very little. And then it's right considering the legislature's silence. And I'll start with the plain language. The statute provides that a doctor can overcome immunity if the doctor can show an intention to harm or, if not intentional, an utter indifference or conscious disregard for a person's own safety or the safety of others. And I think there's then two ways you can get around immunity. First, you could say that there was an intention to harm a person's own safety or the safety of others. Or second, you could say that there was an utter indifference or conscious disregard for harm to a person's own safety or the safety of others. So the harm that we're talking about, whether it's intentional conduct or non-intentional conduct, is harm to a person's own safety or the safety of others, and that's physical harm. Can you give me a fact scenario where a peer review committee, assuming that the facts pled here are, you know, let's say there are clear facts of a breach of contract, getting beyond that, and so there's immunity. What kind of facts would fall in here? The peer review committee is saying we're going to not license this doctor, and how is the doctor's own safety going to be implicated in that? I think that, first of all, we are dealing with something that's a very limited circumstance, which I think is perfectly fine because in the previous version of the statute, the statute provided absolute immunity in this court in the Cargill case, so that was perfectly fine. But now there is this limited exception. And I think that we have to remember that these are very charged decisions. These are professionals who have spent countless years getting the credentials that they get, and they're getting self-policed by their peers. And I do not think it's inconceivable that a doctor, in the context of a professional review action, could allege some tort-like conduct, intentional infliction of emotional distress comes to mind, with some tort-like conduct that then takes you out of the civil damages committee. But it's a tort-like conduct. It's not a civil breach of contract. Can you give me a fact scenario where their safety is at risk? A doctor's safety is at risk by the credentialing committee's actions. I think that it would be some sort of conduct during the peer review process or the professional review process that leads to an intentional infliction of emotional distress that physically manifests. And that will be a limited circumstance. But there are cases, Dr. Benson, who filed an amicus brief, he alleges that type of conduct. He alleges physical harm and emotional distress based on a professional review action. There's cases... So you believe emotional distress is sufficient for the finding of physical harm that you're describing that the statute is referring to? Yes. And I think that will be a very limited circumstance, but I think that is the type of conduct. It's, again, tort-like conduct we're talking about. And that makes sense when you consider what willful and wantful conduct means. Now, we're dealing with a statutory definition here. So we're dealing with what does the statute say. We don't really have to look outside the statute. But this court has recognized in the Herwin case that willful and wanton conduct, just alleging willful and wanton conduct, does not create a separate court. And then in the Morrow case, you don't really have a willful and wanton breach of contract because fault is irrelevant to a breach of contract. It either is or it isn't. And you can't overcome immunity just by saying, well, this is just a really bad breach of contract, because where does that end? Where is the line drawn? Every case will end up in the circuit court if that's all the doctor has to collect. And that's not what the legislature wants. Dr. Balfour cited several cases to suggest that willful and wanton conduct doesn't have to always require physical harm. He cited the Zarco case, the Murray case, the Snyder case. Those cases, again, they're not persuasive here. One, because we're dealing with a statutory exception. And they're not persuasive. Second, because all three of those cases dealt with severe, catastrophic physical injuries. Herwin was a train and truck collision. Murray was a trampoline accident that left the plane in a quadriplegic. And Snyder was a third district case where a tractor accident left the plane without a limb. They aren't breach of contract cases in the context of licensing activity. So those cases are of little value here. And it cannot be, again, just a breach of contract that allows for willful conduct. And then finally, Dr. Balfour talks about the Malakouti and the Levinson cases. Those are federal cases. Those cases shouldn't be persuasive here. They were cases that came to decision in the federal district courts in Illinois on motions to dismiss and on a full court summary judgment record. Both cases involved plaintiffs, again, who alleged court conduct. Again, Dr. Balfour doesn't have any court claims here. And Levitin recognized that there was very severe egregious conduct. If you look at Levitin compared to this case, it's not even close. Dr. Balfour also argues that this is special legislation somehow. That's wrong. It's not special legislation. He realizes that all he's asking for here is a way to get around immunity. He's not talking about fundamental rights. He can't show that this statute is arbitrary. He can't show that hospitals and those groups that are similarly situated are treated differently in different circles. They're all treated the same. And then Dr. Balfour argues that this statute somehow provides absolute immunity. It doesn't do that. First, like I said, this is a case that only provides immunity for civil damages. You can still bring a case for a declaratory judgment or an injunction. And the reality is, if Dr. Balfour's interpretation is right, it will be completely contrary to what the legislature wanted. The legislature struck a balance. On the one hand, hospitals are given broad immunity for their professional review decisions. They don't have to look over their shoulder when they provide three years of professional review like that for civil damages. On the other hand, if at the beginning of that process the doctor thinks the wrong bylaws are applied, you can go into court and you can get your injunction or declaratory judgment and make sure that the right bylaws are applied. But what you can't do is spend three years litigating in a professional review setting and then say, you know what, I lost there. Let me just go to court and relitigate it again. If that's the case, then hospitals either won't engage in robust professional review, or when they do, the hospitals will just make a summary decision and say, let's just deal with it in court, which is not what the legislature wanted. And the practice is not really self-reliant like the legislature had planned it to be. I'd like to briefly now mention the Health Care Quality Improvement Act. That's a federal act. It provides immunity in a very similar circumstance than the licensing act. It's a separate and independent basis why this court is adjourned. The Immunity Act, again, is designed to ensure that it's doctors and hospitals that are making these professional decisions. The Immunity Act applies with a presumption. So when a hospital raises the Improvement Act immunity, it's presumptively applicable, even on summary judgment. So what Dr. Valter has to do to overcome this immunity is to show that somehow one of the four elements of the act aren't met, and he's got to show that by a recurrence of the evidence. Again, he can't do that here. Here we're dealing with a situation where Dr. Valter's allegation is essentially that North Shore applied with the wrong bylaws in his case to breach a contract again. And whether or not right or wrong bylaws were applied, you could assume that the wrong bylaws were applied, but the Improvement Act immunity would still apply as long as North Shore meets the four elements, and it does. There's no question that in this case North Shore made every effort to improve quality care. That's what the decision was designed to do. The hospital decided that Dr. Valter would perform unnecessary surgery, so it made a decision. North Shore made a reasonable effort, and more than a reasonable effort, an extraordinary effort to obtain the facts. Does the HCQIA preempt the HLN? I don't think it preempts. I think that the licensing act should apply first, and both statutes should apply here. But I don't think there's a preemption problem. The third factor that the HCQIA looks to is whether the doctor was provided fair notice, adequate notice, and objectively fair hearing. Dr. Valter was given that here. He complains that Dr. Nelson and Dr. Silver were participants in early decisions regarding his professional review. But after that, there was an ad hoc hearing committee where he had three days of hearing before the hospital. He had a lawyer. He cross-examined witnesses. He made written submissions. The hospital would give him more time when he asked for it. He had an objectively fair hearing. And then finally, you have to look at the totality of the circumstances and ask whether the decision that North Shore made was warranted. It's an objective fact. It's not an subjective fact, and it was here. So I'd ask that this court follow the—not follow, but agree with the three Illinois appellate decisions that are found in the Licensing Act applies, and provide immunity on that. And then alternatively, or in conjunction with the Licensing Act, the Health Care Quality Improvement Act applies as well, and this court could affirm on that case. And I'll leave the rest of my time to Mr. Douglas. Thank you. May it please the Court, Madam Chief Justice. My name is David Douglas. I'm the head of the North Shore University Health System. Regardless of your view and outcome of the Illinois Hospital Licensing Act, there's an independent basis by which to affirm the appellate court's decision. North Shore complied with the bylaws, the applicable bylaws at all times, and there was no breach of contract here. As a result, summary judgment should be affirmed in favor of North Shore. Dr. Valford's only claim in this case is a breach of contract. The hospital bylaws are that contract between the physicians and the hospital. The circuit court found that there was no issue as to any material fact related to North Shore's compliance with the irrelevant provisions of the bylaws. North Shore complied with the bylaws related to reappointment. That is the controlling provision of the bylaws as admitted by Dr. Valford and is litigated for three years at the hospital as well as five years post the hospital process completion. The appellate court did not find it necessary to address this item or address this issue. However, this court, as you well know, can affirm on any independent basis, and we submit this is just one. Let's review for a moment the facts that are in the record. First, Dr. Valford applied for reappointment at the hospital. That is the process that triggered the entire procedural process that followed that is embedded within the bylaws, his application in 2002. Next, members of the obstetrics and gynecological department reviewed Dr. Valford's patient files, a requirement that is embedded within the bylaws. In that review of Dr. Valford's patient files, they found that he performed unnecessary surgeries. In the cases they reviewed, over 50% of the cases, he had performed an unnecessary surgery, including the removal of ovaries. Next, that information was submitted to the executive committee for a determination where they recommended non-reappointment. Dr. Valford, as was his right under the bylaws, challenged that decision. He was given and granted a three-day hearing where he called by witnesses, the hospital called by witnesses, direct testimony, cross-examination testimony. At the conclusion of that, Dr. Valford's lawyer, as he was represented by counsel, stated, you have given Dr. Valford more than an adequate chance to be heard. Unfortunately for Dr. Valford, the unanimous decision of that hearing committee was to recommend non-reappointment. Next, Dr. Valford chose to challenge that decision, again, as was his right, of an appellate committee was appointed. That appellate committee, again, affirmed, reviewing the body of evidence, the decision and recommendation to non-reappointment. And finally and ultimately, the board of directors of North Shore University Health System reviewed the body of evidence that had been collected for three years and affirmed and made the final decision to not reappoint. Only the board of directors of the hospital, in the bylaws, has the ability to make a final determination on appointment or non-reappointment. Dr. Valford availed himself of this procedural policy for over three years. Afterwards, now in litigation, three years after process, five years after litigation, he has said, I was actually reappointed and a different process should have occurred or should have applied to me. Dr. Valford is wrong for two reasons. First, as stated, the board of directors is the only body that can reappoint or decide not to reappoint. The record is clear and there is no material issue of fact that the board of directors decided definitively and decisively not to reappoint Dr. Valford. Nowhere in the record is there a reappointment by the board of directors for Dr. Valford. Second, Dr. Valford claims that his status as a physician, as a current physician on staff during the pendency of the procedures, confirms that he was reappointed. Wrong again. The bylaws require the hospital to allow him to exhaust all hearing and appeal rights before they can change or remove his status. That's what happened. As a result, Your Honor, there is no material issue of fact that North Shore complied with the bylaws. There's no material issue of fact that the reappointment provisions apply to Dr. Valford's claim. There's no material issue of fact that Dr. Valford was provided substantive procedural due process. And there's no material issue of fact that there is no breach of contract. As a result, Your Honor, we do request that you affirm the appellate court decision for the two independent reasons. First, that North Shore has immunity under either the Illinois Hospital Licensing Act or the Federal Healthcare Quality Licensing Act, regardless of whether there was a breach. And second, that there was no breach of contract in this case. Thank you for your time and consideration. Thank you, counsel. I'll first address the summary judgment, if that's okay. What counsel ignores, he presents a very compelling argument that this is about reappointment, but he ignores a couple of very salient facts. First of all, Dr. Valford's previous appointment expired by its own terms on May 31st, 2002. He went to work June 1st, June 2nd, June 3rd. What was he doing on the premises if he hadn't been reappointed? On June 4th, he's confronted by his superiors and he's told, either you voluntarily relinquish your gynecological procedure processes or we're going to summarily suspend you. There's nothing to summarily suspend if he doesn't already have privileges. And the privileges had expired. So that raises a question of fact as to whether he had been reappointed. Yes, it's absolutely true. There's no letter in the record saying, yes, Dr. Valford, you have been reappointed. And it's also true that at the end of the three-day hearing, Dr. Valford's counsel said, yes, we got everything, thank you very much. Well, you can say whatever he was, thank you very much doesn't mean very much to me. But especially it was not until four or five years later that Dr. Valford received in discovery the screenshots from the hospital, the computer forms that showed that by their own statements, he had been reappointed. And that raises a question of fact to me also. They say, oh, Dr. Valford voluntarily relinquished his procedure privileges. That's nonsense. You're faced with the question of either you voluntarily give it up or we're going to summarily suspend you. And if we summarily suspend you, that goes to the National Data Bank right away. What are you going to do? He had no choice. So those are questions of fact. And the screenshots were not, that is significant because they didn't come up until later. So I don't think that they have summary judgment on their case. I mean, if it were just talking about reappointment, maybe. But we're not just talking about reappointment. We're talking about revocation of privileges. And that has been the case since Dr. Valford filed his lawsuit. And the first time it was up, he voluntarily dismissed it and refiled it. The summary judgment was denied by Judge Sanjay Taylor of the Circuit Court of Cook County. So I think there is a question of fact as to whether summary judgment was appropriate. Going on to special legislation, they say hospitals, all hospitals are treated the same. And they won't engage in robust review if we don't give them this immunity. First of all, in none of these cases is there any evidence about whether there's going to be robust review or not and whether that really gives them the right to get absolute immunity. And I believe this is absolute immunity because the right to declaratory relief or an injunction doesn't have anything. There's very little protection. It's absolute immunity. You can have all the sham peer review you want now because there's no remedy for a doctor. You can go and get injunctions. They use the right bylaws, but there's no review of it. There's no possible remedy for a doctor. And why should that be? Interestingly enough, we think doctors, we know it's obfuscate. It's very important to have robust review. And it's important for doctors to participate in peer review. But just for a minute, compare it to what lawyers have to do. Under your rule, under N. Ray Himmel, if I know, have actual knowledge, that another lawyer has done something wrong, I'm obligated to report that or else I am at risk of losing my license. Yet doctors have this special absolute immunity. I don't think it's necessary. I don't think that that was ever intended by the legislature. There's certainly no showing of it. And the fact that there was previously, that the statute previously gave hospitals absolute immunity to me is also irrelevant because it wasn't ever challenged on special legislation grounds. And so we don't know if that would survive. I submit it, would that survive absolute immunity? I don't think it's appropriate and there's no showing for it. Finally, under the federal statute, whether they're entitled to affirmance based on the federal statute, the statute requires reasonable belief, reasonable belief, reasonable conduct, and preponderance of the evidence. And the case they rely on, Clark from the Nevada Supreme Court, goes in favor of Dr. Velter, not in favor of the hospital. If they don't follow their bylaws and they have a deliberate intent to harm here, there should be no immunity under the federal law. Finally, the two cases I cite from the federal district court, obviously you're not bound by them, but they are persuasive authority and they show that there is some ambiguity here and that other courts have found, even though they were on motions to dismiss, not summary judgment, that the courts found that the plaintiffs did not have to plead physical harm. There was no showing. Nobody ever suggested a pleading of physical harm. So no further questions? It doesn't appear so, counsel. Thank you so much. Thank you. Case 119220, Stephen I. Velfer, M.D., versus Evanston Northwestern Health Care, etc., will be taken under advisement as agenda number 12. Ms. Rosen, Mr. Carter, Mr. Daulquist, thank you for your arguments this morning